**In re: Bruce R. LINDSEY (Grand Jury Testimony)**

**Nos. 98–3060, 98–3062 and 98–3072.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 29, 1998.

Decided July 27, 1998.

W. Neil Eggleston, Washington, DC, argued the cause for appellant the Office of the President, with whom Timothy K. Armstrong, Julie K. Brof, Washington, DC, and Charles F.C. Ruff, Counsel to the President, were on the briefs.

David E. Kendall, Washington, DC, argued the cause for appellant William J. Clinton, with whom Nicole K. Seligman, Washington, DC, Max Stier, Robert S. Bennett, Carl S. Rauh, Washington, DC, Amy Sabrin and Katharine S. Sexton were on the briefs.

Douglas N. Letter, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for amicus curiae the Attorney General, with whom Janet Reno, Attorney General, Frank W. Hunger, Assistant Attorney General, Stephen W. Preston, Deputy Assistant Attorney General, and Stephanie R. Marcus, Attorney, New York City, were on the brief.

Kenneth W. Starr, Independent Counsel and Brett M. Kavanaugh, Associate Independent Counsel, Washington, DC, argued the causes for appellee the United States, with whom Joseph M. Ditkoff, Associate Independent Counsel, Arlington, VA, was on the brief.

Before: RANDOLPH, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed PER CURIAM.

Opinion dissenting from Part II and concurring in part and dissenting in part from Part III filed by Circuit Judge TATEL.

PER CURIAM:

In these expedited appeals, the principal question is whether an attorney in the Office of the President, having been called before a federal grand jury, may refuse, on the basis of a government attorney-client privilege, to answer questions about possible criminal conduct by government officials and others. To state the question is to suggest the answer, for the Office of the President is a part of the federal government, consisting of government employees doing government business, and neither legal authority nor policy nor experience suggests that a federal government entity can maintain the ordinary common law attorney-client privilege to withhold information relating to a federal criminal offense. The Supreme Court and this court have held that even the constitutionally based executive privilege for presidential communications fundamental to the operation of the government can be overcome upon a proper showing of need for the evidence in criminal trials and in grand jury proceedings. *See United States v. Nixon*, 418 U.S. 683, 707–12, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *In re Sealed Case*, 121 F.3d 729, 736–38 (D.C.Cir.1997). In the context of federal criminal investigations and trials, there is no basis for treating legal advice differently from any other advice the Office of the President receives in performing its constitutional functions. The public interest in honest government and in exposing wrongdoing by government officials, as well as the tradition and practice, acknowledged by the Office of the President and by former White House Counsel, of government lawyers reporting evidence of federal criminal offenses whenever such evidence comes to them, lead to the conclusion that a government attorney may not invoke the attorney-client privilege in response to grand jury questions seeking information relating to the possible commission of a federal crime. The extent to which the communications of White House Counsel are privileged against disclosure to a federal grand jury depends, therefore, on whether the communications contain information of possible criminal offenses. Additional protection may flow from executive privilege [[

]].*

I.

On January 16, 1998, at the request of the Attorney General, the Division for the Purpose of Appointing Independent Counsels issued an order expanding the prosecutorial

---

* Double brackets signify sealed material.

jurisdiction of Independent Counsel Kenneth W. Starr. Previously, the main focus of Independent Counsel Starr's inquiry had been on financial transactions involving President Clinton when he was Governor of Arkansas, known popularly as the Whitewater inquiry. The order now authorized Starr to investigate "whether Monica Lewinsky or others suborned perjury, obstructed justice, intimidated witnesses, or otherwise violated federal law" in connection with the civil lawsuit against the President of the United States filed by Paula Jones. *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 497–98 (D.C.Cir.), *petition for cert. filed*, 66 U.S.L.W. 3790 (U.S. June 3, 1998) (No. 97–1959) (quoting order). "Thereafter, a grand jury here began receiving evidence about Monica Lewinsky and President Clinton, and others...." *Id.* at 498.

On January 30, 1998, the grand jury issued a subpoena to Bruce R. Lindsey, an attorney admitted to practice in Arkansas. Lindsey currently holds two positions: Deputy White House Counsel and Assistant to the President. On February 18, February 19, and March 12, 1998, Lindsey appeared before the grand jury and declined to answer certain questions on the ground that the questions represented information protected from disclosure by a government attorney-client privilege applicable to Lindsey's communications with the President as Deputy White House Counsel, as well as by executive privilege, and [[ ]]. Lindsey also claimed work product protections related to the attorney-client privilege[[ ]].

On March 6, 1998, the Independent Counsel moved to compel Lindsey's testimony. The district court granted that motion on May 4, 1998. The court concluded that the President's executive privilege claim failed in light of the Independent Counsel's showing of need and unavailability. *See In re Sealed Case*, 121 F.3d at 754. It rejected Lindsey's government attorney-client privilege claim on similar grounds, ruling that the President possesses an attorney-client privilege when consulting in his official capacity with White House Counsel, but that the privilege is qualified in the grand jury context and may be overcome upon a sufficient showing of need for the subpoenaed communications and unavailability from other sources. [[

]].

[[ ]] the Office of the President [[ ]] appealed the order granting the motion to compel Lindsey's testimony, challenging the district court's construction of both the government attorney-client privilege and [[ ]]. The Independent Counsel then petitioned the Supreme Court to review the district court's decision on those issues, among others, before judgment by this court. On June 4, 1998, the Supreme Court denied certiorari, while indicating its expectation that "the Court of Appeals will proceed expeditiously to decide this case." *United States v. Clinton*, — U.S. —, 118 S.Ct. 2079, 141 L.Ed.2d 155 (1998). Following an expedited briefing schedule, on June 29, 1998, this court heard argument on the attorney-client issues. Neither the Office of the President nor the President in his personal capacity has appealed the district court's ruling on executive privilege. In Part II we address the availability of the government attorney-client privilege; [[

]].

## II.

■ The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services. *See In re Sealed Case*, 737 F.2d 94, 98–99 (D.C.Cir.1984). It "is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, — U.S. —, 118 S.Ct. 2081, 2084–85, 141 L.Ed.2d 379 (1998).

The Office of the President contends that Lindsey's communications with the President and others in the White House should fall within this privilege both because the President, like any private person, needs to communicate fully and frankly with his legal advisors, and because the current grand jury investigation may lead to impeachment proceedings, which would require a defense of

the President's official position as head of the executive branch of government, presumably with the assistance of White House Counsel. The Independent Counsel contends that an absolute government attorney-client privilege would be inconsistent with the proper role of the government lawyer and that the President should rely only on his private lawyers for fully confidential counsel.

██ Federal courts are given the authority to recognize privilege claims by Rule 501 of the Federal Rules of Evidence, which provides that

> [e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

FED. R. EVID. 501. Although Rule 501 manifests a congressional desire to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis, *see Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the Supreme Court has been "disinclined to exercise this authority expansively," *University of Pa. v. EEOC*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). "[T]hese exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Nixon*, 418 U.S. at 710, 94 S.Ct. 3090; *see also Trammel*, 445 U.S. at 50, 100 S.Ct. 906. Consequently, federal courts do not recognize evidentiary privileges unless doing so "promotes sufficiently important interests to outweigh the need for probative evidence." *Id.* at 51, 100 S.Ct. 906.

██ The Supreme Court has not articulated a precise test to apply to the recognition of a privilege, but it has "placed considerable weight upon federal and state precedent," *In re Sealed Case*, 148 F.3d 1073, 1076 (D.C.Cir. 1998), and on the existence of "a 'public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'" *Jaffee v. Redmond*, 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (quoting *Trammel*, 445 U.S. at 50, 100 S.Ct. 906 (quoting *Elkins v. United States*, 364 U.S. 206, 234, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting))). That public good should be shown "with a high degree of clarity and certainty." *In re Sealed Case*, 148 F.3d at 1076.

### A.

Courts, commentators, and government lawyers have long recognized a government attorney-client privilege in several contexts. Much of the law on this subject has developed in litigation about exemption five of the Freedom of Information Act ("FOIA"). *See* 5 U.S.C. § 552(b)(5) (1994). Under that exemption, "intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" are excused from mandatory disclosure to the public. *Id.; see also* S. REP. No. 89–813, at 2 (1965) (including within exemption five "documents which would come within the attorney-client privilege if applied to private parties"). We have recognized that "Exemption 5 protects, as a general rule, materials which would be protected under the attorney-client privilege." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 862 (D.C.Cir.1980). "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C.Cir.1997); *see also Brinton v. Department of State*, 636 F.2d 600, 603–04 (D.C.Cir.1980). In Lindsey's case, his client—to the extent he provided legal services—would be the Office of the President.[1]

██ Exemption five does not itself create a government attorney-client privilege.

1. [[

]]

Rather, "Congress intended that agencies should not lose the protection traditionally afforded through the evidentiary privileges simply because of the passage of the FOIA." *Coastal States,* 617 F.2d at 862. In discussing the government attorney-client privilege applicable to exemption five, we have mentioned the usual advantages:

> the attorney-client privilege has a proper role to play in exemption five cases.... In order to ensure that a client receives the best possible legal advice, based on a full and frank discussion with his attorney, the attorney-client privilege assures him that confidential communications to his attorney will not be disclosed without his consent. We see no reason why this same protection should not be extended to an agency's communications with its attorneys under exemption five.

*Mead Data Cent., Inc. v. United States Dep't of Air Force,* 566 F.2d 242, 252 (D.C.Cir. 1977). Thus, when "the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests, and needs the same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors," exemption five applies. *Coastal States,* 617 F.2d at 863.

Furthermore, the proposed (but never enacted) Federal Rules of Evidence concerning privileges, to which courts have turned as evidence of common law practices, *see, e.g., United States v. Gillock,* 445 U.S. 360, 367–68, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980); *In re Bieter Co.,* 16 F.3d 929, 935 (8th Cir.1994); *Linde Thomson Langworthy Kohn & Van Dyke v. Resolution Trust Corp.,* 5 F.3d 1508, 1514 (D.C.Cir.1993); *United States v. (Under Seal),* 748 F.2d 871, 874 n. 5 (4th Cir. 1984); *United States v. Mackey,* 405 F.Supp. 854, 858 (E.D.N.Y.1975), recognized a place for a government attorney-client privilege. Proposed Rule 503 defined "client" for the purposes of the attorney-client privilege to include "a person, public officer, or corporation, association, or other organization or entity, either public or private." PROPOSED FED. R. EVID. 503(a)(1), *reprinted in* 56 F.R.D. 183, 235 (1972). The commentary to the proposed rule explained that "[t]he defi-

nition of 'client' includes governmental bodies." *Id.* advisory committee's note. The Restatement also extends attorney-client privilege to government entities. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 124 (Proposed Final Draft No. 1, 1996) [hereinafter RESTATEMENT].

The practice of attorneys in the executive branch reflects the common understanding that a government attorney-client privilege functions in at least some contexts. The Office of Legal Counsel in the Department of Justice concluded in 1982 that

> [a]lthough the attorney-client privilege traditionally has been recognized in the context of private attorney-client relationships, the privilege also functions to protect communications between government attorneys and client agencies or departments, as evidenced by its inclusion in the FOIA, much as it operates to protect attorney-client communications in the private sector.

Theodore B. Olsen, Assistant Attorney General, Office of Legal Counsel, *Confidentiality of the Attorney General's Communications in Counseling the President,* 6 Op. Off. Legal Counsel 481, 495 (1982). The Office of Legal Counsel also concluded that when government attorneys stand in the shoes of private counsel, representing federal employees sued in their individual capacities, confidential communications between attorney and client are privileged. *See* Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Disclosure of Confidential Information Received by U.S. Attorney in the Course of Representing a Federal Employee* (Nov. 30, 1976); Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, *Duty of Government Lawyer Upon Receipt of Incriminating Information in the Course of an Attorney–Client Relationship with Another Government Employee* (Mar. 29, 1985); *see also* 28 C.F.R. § 50.15(a)(3) (1998).

**B.**

Recognizing that a government attorney-client privilege exists is one thing. Finding that the Office of the President is entitled to assert it here is quite another.

 It is settled law that the party claiming the privilege bears the burden of proving that the communications are protected. As oft-cited definitions of the privilege make clear, only communications that seek "legal advice" from "a professional legal adviser in his capacity as such" are protected. *See* 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2292, at 554 (McNaughton rev.1961). Or, in a formulation we have adopted, the privilege applies only if the person to whom the communication was made is "a member of the bar of a court" who "in connection with th[e] communication is acting as a lawyer" and the communication was made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Sealed Case*, 737 F.2d at 98–99 (quoting *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)).

 On the record before us, it seems likely that at least some of the conversations for which Lindsey asserted government attorney-client privilege did not come within the formulation just quoted. [[

]]. Both of these subjects arose from the expanded jurisdiction of the Independent Counsel, which did not become public until January 20, 1998. Before then, any legal advice Lindsey rendered in connection with *Jones v. Clinton*, a lawsuit involving President Clinton in his personal capacity, likely could not have been covered by government attorney-client privilege.[2] [[

 ]]. According to the Restatement, "consultation with one admitted to the bar but not in that other person's role as lawyer is not protected." RESTATEMENT § 122 cmt. c. "[W]here one consults an attorney not as a lawyer but as a friend or as a business adviser or banker, or negotiator ... the consultation is not professional nor the statement privileged." 1 MCCORMICK ON EVIDENCE § 88, at 322–24 (4th ed.1992) (footnotes omitted). Thus Lindsey's advice on political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure by the attorney-client privilege.

 As for conversations after January 20th, the Office of the President must "present the underlying facts demonstrating the existence of the privilege" in order to carry its burden. *See FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir.1980). A blanket assertion of the privilege will not suffice. Rather, "[t]he proponent must conclusively prove each element of the privilege." *SEC v. Gulf & Western Indus.*, 518 F.Supp. 675, 682 (D.D.C.1981). In response to the Independent Counsel's questions, Lindsey invariably asserted executive privilege and attorney-client privilege. On this record, it is impossible to determine whether Lindsey believed that both privileges applied or whether he meant to invoke them on an "either/or" basis. As we have said, the district court's rejection of the executive privilege claim has not been appealed. With this privilege out of the picture, the Office of the President had to show that Lindsey's conversations "concerned the seeking of legal advice" and were between President Clinton and Lindsey or between others in the White House and Lindsey while Lindsey was "acting in his professional capacity" as an attorney. *Shaffner*, 626 F.2d at 37.

With regard to most of the communications that were the subject of questions be-

---

2. We do not foreclose a showing by Lindsey when he appears again before the grand jury that prior to January 20, 1998, he gave legal advice as

Deputy White House Counsel in regard to how private litigation involving the President was affecting the Office of the President.

fore the grand jury, it does not appear to us that any such showing was made in the grand jury by Lindsey or in the district court by the Office of the President in the proceedings leading to the order to compel his testimony. This may be attributable to the parties' focus in the district court. The arguments on both sides centered on whether any attorney-client privilege protected the conversations about which Lindsey was asked, not on whether—if the privilege could be invoked—the conversations were covered by it. In light of this, and in view of the Administration's abandonment of its executive privilege claim, Lindsey would have to return to the grand jury no matter how we ruled on the government attorney-client privilege claim.

There is, however, no good reason for withholding decision on the issues now before us. We have little doubt that at least *one* of Lindsey's conversations subject to grand jury questioning "concerned the seeking of legal advice" and was between President Clinton and Lindsey or between others in the White House and Lindsey while Lindsey was "acting in his professional capacity" as an attorney. *See id.* [[

]]. The issue whether the government attorney-client privilege could be invoked in these circumstances is therefore ripe for decision.

Moreover, the case has been fully briefed and argued. The Supreme Court has asked us to expedite our disposition of these appeals. Sending this case back for still another round of grand jury testimony, assertions of privileges and immunities, a district court judgment, and then another appeal would be inconsistent with the Supreme Court's request and would do nothing but prolong the grand jury's investigation. The parties, we

believe, are entitled now to a ruling to govern Lindsey's future grand jury appearance.

We therefore turn to the question whether an attorney-client privilege permits a government lawyer to withhold from a grand jury information relating to the commission of possible crimes by government officials and others. Although the cases decided under FOIA recognize a government attorney-client privilege that is rather absolute in civil litigation, those cases do not necessarily control the application of the privilege here. The grand jury, a constitutional body established in the Bill of Rights, "belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people," *United States v. Williams*, 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), while the Independent Counsel is by statute an officer of the executive branch representing the United States. For matters within his jurisdiction, the Independent Counsel acts in the role of the Attorney General as the country's chief law enforcement officer. *See* 28 U.S.C. § 594(a) (1994). Thus, although the traditional privilege between attorneys and clients shields private relationships from inquiry in either civil litigation or criminal prosecution, competing values arise when the Office of the President resists demands for information from a federal grand jury and the nation's chief law enforcement officer. As the drafters of the Restatement recognized, "More particularized rules may be necessary where one agency of government claims the privilege in resisting a demand for information by another. Such rules should take account of the complex considerations of governmental structure, tradition, and regulation that are involved." RESTATEMENT § 124 cmt. b. For these reasons, others have agreed that such "considerations" counsel against "expansion of the privilege to all governmental entities" in all cases. 24 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5475, at 125 (1986).

The question whether a government attorney-client privilege applies in the federal grand jury context is one of first impression in this circuit, and the parties dispute the import of the lack of binding authority. The

Office of the President contends that, upon recognizing a government attorney-client privilege, the court should find an *exception* in the grand jury context only if practice and policy require. To the contrary, the Independent Counsel contends, in essence, that the justification for any *extension* of a government attorney-client privilege to this context needs to be clear. These differences in approach are not simply semantical: they represent different versions of what is the status quo. To argue about an "exception" presupposes that the privilege otherwise applies in the federal grand jury context; to argue about an "extension" presupposes the opposite. In *Swidler & Berlin*, the Supreme Court considered whether, as the Independent Counsel contended, it should create an exception to the personal attorney-client privilege allowing disclosure of confidences after the client's death. *See Swidler & Berlin*, —— U.S. ——, ——, 118 S.Ct. 2081, 2083–84, 141 L.Ed.2d 379 (1998). After finding that the Independent Counsel was asking the Court "not simply to 'construe' the privilege, but to narrow it, contrary to the weight of the existing body of caselaw," the Court concluded that the Independent Counsel had not made a sufficient showing to warrant the creation of such an exception to the settled rule. *Id.* at 2087–88.

█ In the instant case, by contrast, there is no such existing body of caselaw upon which to rely and no clear principle that the government attorney-client privilege has as broad a scope as its personal counterpart. Because the "attorney-client privilege must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle,'" *In re Sealed Case*, 676 F.2d 793, 807 n. 44 (D.C.Cir.1982) (quoting *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir.1979)); *accord Trammel*, 445 U.S. at 50, 100 S.Ct. 906, and because the government attorney-client privilege is not recognized in the same way as the personal attorney-client privilege addressed in *Swidler & Berlin*, we believe this case poses the

question whether, in the first instance, the privilege extends as far as the Office of the President would like. In other words, pursuant to our authority and duty under Rule 501 of the Federal Rules of Evidence to interpret privileges "in light of reason and experience," FED. R. EVID. 501, we view our exercise as one in defining the particular contours of the government attorney-client privilege.

When an executive branch attorney is called before a federal grand jury to give evidence about alleged crimes within the executive branch, reason and experience, duty, and tradition dictate that the attorney shall provide that evidence. With respect to investigations of federal criminal offenses, and especially offenses committed by those in government, government attorneys stand in a far different position from members of the private bar. Their duty is not to defend clients against criminal charges and it is not to protect wrongdoers from public exposure. The constitutional responsibility of the President, and all members of the Executive Branch, is to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. Investigation and prosecution of federal crimes is one of the most important and essential functions within that constitutional responsibility. Each of our Presidents has, in the words of the Constitution, sworn that he "will faithfully execute the Office of President of the United States, and will to the best of [his] Ability, preserve, protect and defend the Constitution of the United States." *Id.* art. II, § 1, cl. 8. And for more than two hundred years each officer of the Executive Branch has been bound by oath or affirmation to do the same. *See id.* art. VI, cl. 3; *see also* 28 U.S.C. § 544 (1994). This is a solemn undertaking, a binding of the person to the cause of constitutional government, an expression of the individual's allegiance to the principles embodied in that document. Unlike a private practitioner, the loyalties of a government lawyer therefore cannot and must not lie solely with his or her client agency.[3]

---

3. We recognize, as our dissenting colleague emphasizes, that every lawyer must take an oath to enter the bar of any court. But even after entering the bar, a government attorney must take

another oath to enter into government service; that in itself shows the separate meaning of the government attorney's oath. Moreover, the oath is significant to our analysis only to the extent

The oath's significance is underscored by other evocations of the ethical duties of government lawyers.[4] The Professional Ethics Committee of the Federal Bar Association has described the public trust of the federally employed lawyer as follows:

> [T]he government, over-all and in each of its parts, is responsible to the people in our democracy with its representative form of government. Each part of the government has the obligation of carrying out, in the public interest, its assigned responsibility in a manner consistent with the Constitution, and the applicable laws and regulations. In contrast, the private practitioner represents the client's personal or private interest. . . . [W]e do not suggest, however, that the public is the client as the client concept is usually understood. It is to say that the lawyer's employment requires him to observe in the performance of his professional responsibility the public interest sought to be served by the governmental organization of which he is a part.

*Federal Bar Association Ethics Committee, The Government Client and Confidentiality: Opinion 73–1,* 32 FED. B.J. 71, 72 (1973). Indeed, before an attorney in the Justice Department can step into the shoes of private counsel to represent a federal employee sued in his or her individual capacity, the Attorney General must determine whether the representation would be in the interest of the United States. *See* 28 C.F.R. § 50.15(a). The obligation of a government lawyer to uphold the public trust reposed in him or her strongly militates against allowing the client agency to invoke a privilege to prevent the

lawyer from providing evidence of the possible commission of criminal offenses within the government. As Judge Weinstein put it, "[i]f there is wrongdoing in government, it must be exposed. . . . [The government lawyer's] duty to the people, the law, and his own conscience requires disclosure. . . . " Jack B. Weinstein, *Some Ethical and Political Problems of a Government Attorney,* 18 MAINE L. REV. 155, 160 (1966).

This view of the proper allegiance of the government lawyer is complemented by the public's interest in uncovering illegality among its elected and appointed officials. While the President's constitutionally established role as superintendent of law enforcement provides one protection against wrongdoing by federal government officials, *see United States v. Valenzuela–Bernal,* 458 U.S. 858, 863, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), another protection of the public interest is through having transparent and accountable government.[5] As James Madison observed,

> [a] popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 THE WRITINGS OF JAMES MADISON 103 (Gaillard Hunt ed., 1910). This court has accordingly recognized that "openness in government has always been thought crucial to ensuring that the people remain in

---

that it underlies the fundamental differences in the roles of government and private attorneys—of particular note, the fact that private attorneys cannot take official actions.

4. Indeed, the responsibilities of government lawyers to the public have long governed the actions they can take on behalf of their "client":
 The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it shall win a case, but that justice shall be done.
 *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In keeping with these interests, prosecutors must disclose to the

defendant exculpatory evidence, *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and must try to "seek justice, not merely to convict," MODEL CODE OF PROFESSIONAL RESPONSIBILITY EC 7–13 (1980). Similarly, the government lawyer in a civil action must "seek justice" and avoid unfair settlements or results. *Id.* EC 7–14.

5. Congress has clearly indicated, as a matter of policy, that federal employees should not withhold information relating to possible criminal misconduct by federal employees on any basis. We discuss at more length Congress's recognition of these concerns below in our discussion of 28 U.S.C. § 535(b).

control of their government." *In re Sealed Case (Espy),* 121 F.3d at 749. Privileges work against these interests because their recognition "creates the risk that a broad array of materials in many areas of the executive branch will become 'sequester[ed]' from public view." *Id.* (quoting *Wolfe v. Department of Health & Human Servs.,* 815 F.2d 1527, 1533 (D.C.Cir.1987)). Furthermore, "to allow any part of the federal government to use its in-house attorneys as a shield against the production of information relevant to a federal criminal investigation would represent a gross misuse of public assets." *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 921 (8th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997).

Examination of the practice of government attorneys further supports the conclusion that a government attorney, even one holding the title Deputy White House Counsel, may not assert an attorney-client privilege before a federal grand jury if communications with the client contain information pertinent to possible criminal violations. The Office of the President has traditionally adhered to the precepts of 28 U.S.C. § 535(b), which provides that

> [a]ny information . . . received in a department or agency of the executive branch of the Government relating to violations of title 18 involving Government officers and employees shall be expeditiously reported to the Attorney General.

28 U.S.C. § 535(b) (1994). We need not decide whether section 535(b) alone requires White House Counsel to testify before a grand jury.[6] The statute does not clearly apply to the Office of the President. The Office is neither a "department," as that term is defined by the statute, *see* 5 U.S.C. § 101 (1994); 28 U.S.C. § 451 (1994); *Haddon v. Walters,* 43 F.3d 1488, 1490 (D.C.Cir. 1995) (per curiam), nor an "agency," *see Kissinger v. Reporters Comm. for Freedom of*

the Press, 445 U.S. 136, 156, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980) (FOIA case); *see also Armstrong v. Executive Office of the President,* 1 F.3d 1274, 1295 (D.C.Cir.1993) (per curiam); *National Sec. Archive v. Archivist of the United States,* 909 F.2d 541, 545 (D.C.Cir.1990) (per curiam). However, at the very least "[section] 535(b) evinces a strong congressional policy that executive branch employees must report information" relating to violations of Title 18, the federal criminal code. *In re Sealed Case (Secret Service),* 148 F.3d at 1078–79. As the House Committee Report accompanying section 535 explains, "[t]he purpose" of the provision is to "require the reporting by the departments and agencies of the executive branch to the Attorney General of information coming to their attention concerning any alleged irregularities on the part of officers and employees of the Government." H.R. REP. No. 83–2622, at 1 (1954). Section 535(b) suggests that all government employees, including lawyers, are duty-bound not to withhold evidence of federal crimes.

Furthermore, government officials holding top legal positions have concluded, in light of section 535(b), that White House lawyers cannot keep evidence of crimes committed by government officials to themselves. In a speech delivered after the *Kissinger* FOIA case was handed down, Lloyd Cutler, who served as White House Counsel in the Carter and Clinton Administrations, discussed the "rule of making it your duty, if you're a Government official as we as lawyers are, a statutory duty to report to the Attorney General any evidence you run into of a possible violation of a criminal statute." Lloyd N. Cutler, *The Role of the Counsel to the President of the United States,* 35 RECORD OF THE ASS'N OF THE BAR OF THE CITY OF NEW YORK No. 8, at 470, 472 (1980). Accordingly, "[w]hen you hear of a charge and you talk to someone in the White House . . . about some allegation of misconduct, almost the first

---

6. 28 U.S.C. § 535(a) authorizes the Attorney General to "investigate any violation of title 18 [the federal criminal code] involving Government officers and employees." The Independent Counsel fills the shoes of the Attorney General in this regard because Congress has given the Independent Counsel "with respect to all matters in

[his] prosecutorial jurisdiction . . . full power and independent authority to exercise all investigative and prosecutorial functions and powers of . . . the Attorney General." 28 U.S.C. § 594(a); *see In re Sealed Case (Secret Service),* 148 F.3d at 1078–79.

thing you have to say is, 'I really want to know about this, but anything you tell me I'll have to report to the Attorney General.'" *Id.* Similarly, during the Nixon administration, Solicitor General Robert H. Bork told an administration official who invited him to join the President's legal defense team: "A government attorney is sworn to uphold the Constitution. If I come across evidence that is bad for the President, I'll have to turn it over. I won't be able to sit on it like a private defense attorney." *A Conversation with Robert Bork,* D.C. BAR REP., Dec. 1997–Jan.1998, at 9.

The Clinton Administration itself endorsed this view as recently as a year ago. In the proceedings leading to the Supreme Court's denial of certiorari with regard to the Eighth Circuit's decision in *In re Grand Jury Subpoena Duces Tecum,* the Office of the President assured the Supreme Court that it "embraces the principles embodied in Section 535(b)" and acknowledged that "the Office of the President has a duty, recognized in official policy and practice, to turn over evidence of the crime." Reply Brief for Office of the President at 7, *Office of the President v. Office of Independent Counsel,* —— U.S. ——, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997) (No. 96–1783). The Office of the President further represented that "on various occasions" it had "referred information to the Attorney General reflecting the possible commission of a criminal offense—including information otherwise protected by attorney-client privilege." *Id.* At oral argument, counsel for the Office of the President reiterated this position. In addition, the White House report on possible misdeeds relating to the White House Travel Office stated that "[i]f there is a reasonable suspicion of a crime . . . about which White House personnel may have knowledge, the initial communication of this information should be made to the Attorney General, the Deputy Attorney General, or the Associate Attorney General." WHITE HOUSE TRAVEL OFFICE MANAGEMENT REVIEW 23 (1993).

We are not aware of any previous deviation from this understanding of the role of government counsel. We know that Nixon White House Counsel Fred Buzhardt testified before the Watergate grand jury without invoking attorney-client privilege, although not much may be made of this.[7] *See* Anthony Ripley, *Milk Producers' Group Fined $5,000 for Nixon Gifts,* N.Y. TIMES, May 7, 1974, at 38. On the other hand, the Office of the President points out that C. Boyden Gray, White House Counsel during the Bush Administration, and his deputy, John Schmitz, refused to be interviewed by the Independent Counsel investigating the Iran–Contra affair and only produced documents subject to an agreement that "any privilege against disclosure . . . including the attorney-client privilege" was not waived. 1 LAWRENCE E. WALSH, FINAL REPORT OF THE INDEPENDENT COUNSEL FOR IRAN/CONTRA MATTERS 478–79 & n.52 (1993). However, the Independent Counsel in that investigation had not subpoenaed Gray or Schmitz to testify before a grand jury, and there is no indication that the information sought from them constituted evidence of any criminal offense. Independent Counsel Walsh apparently sought to question these individuals merely to complete his final report. *See id.* In any event, even outside the grand jury context, the general practice of government counsel has been to cooperate with the investigations of independent counsels. For example, Peter Wallison, White House Counsel under President Reagan, produced his diary for the Iran–Contra investigation and cooperated in other ways. *See id.* at 44, 470 n. 137, 517, 520. Other government attorneys both produced documents and agreed to be interviewed for that investigation. *See id.* at 346–48, 366–68, 536 & nn.116–17, 537.

The Office of the President asserts two principal contributions to the public good that would come from a government attorney's withholding evidence from a grand jury on the basis of an attorney-client privilege. First, it maintains that the values of candor and frank communications that the privilege embodies in every context would apply to Lindsey's communications with the President and others in the White House. Government

---

7. President Nixon waived executive privilege and attorney-client privilege before the grand jury. *See* SPECIAL PROSECUTION FORCE, WATERGATE REPORT 88 (1975) [hereinafter WATERGATE REPORT].

officials, the Office of the President claims, need accurate advice from government attorneys as much as private individuals do, but they will be inclined to discuss their legal problems honestly with their attorneys only if they know that their communications will be confidential.

We may assume that if the government attorney-client privilege does not apply in certain contexts this may chill some communications between government officials and government lawyers. Even so, government officials will still enjoy the benefit of fully confidential communications with their attorneys unless the communications reveal information relating to possible criminal wrongdoing. And although the privacy of these communications may not be absolute before the grand jury, the Supreme Court has not been troubled by the potential chill on executive communications due to the qualified nature of executive privilege.[8] *Compare Nixon,* 418 U.S. at 712–13, 94 S.Ct. 3090 (discounting the chilling effects of the qualification of the presidential communications privilege on the candor of conversations), *with Swidler & Berlin,* —— U.S. ——, ——, 118 S.Ct. 2081, 2086–87, 141 L.Ed.2d 379 (stating, in the personal attorney-client privilege context, that an uncertain privilege is often no better than no privilege at all). Because both the Deputy White House Counsel and the Independent Counsel occupy positions within the federal government, their situation is somewhat comparable to that of corporate officers who seek to keep their communications with company attorneys confidential from each other and from the shareholders. Under the widely followed doctrine announced in *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970), corporate officers are not always entitled to assert such privileges against interests within the corporation, and accordingly must consult with company attorneys aware that their communications may not be kept confidential from shareholders in litigation. *See*

*id.* at 1101. Any chill on candid communications with government counsel flowing from our decision not to extend an absolute attorney-client privilege to the grand jury context is both comparable and similarly acceptable.

Moreover, nothing prevents government officials who seek completely confidential communications with attorneys from consulting personal counsel. The President has retained several private lawyers, and he is entitled to engage in the completely confidential communications with those lawyers befitting an attorney and a client in a private relationship. [[ ]]

The Office of the President contends that White House Counsel's role in preparing for any future impeachment proceedings alters the policy analysis.[9] The Ethics in Government Act requires the Independent Counsel to "advise the House of Representatives of any substantial and credible information ... that may constitute grounds for an impeachment." 28 U.S.C. § 595(c) (1994). In November 1997, a Congressman introduced a resolution in the House of Representatives calling for an inquiry into possible grounds for impeachment of the President. *See* H.R. Res. 304, 105th Cong. (1997). Thus, to the extent that impeachment proceedings may be on the horizon, the Office of the President contends that White House Counsel must be given maximum protection against grand jury inquiries regarding their efforts to protect the Office of the President, and the President in his personal capacity, against impeachment. Additionally, the Office of the President notes that the Independent Counsel serves as a conduit to Congress for information concerning grounds for impeachment obtained by the grand jury, and, consequently, an exception to the attorney-client privilege before the grand jury will effectively abrogate any absolute privilege those communications might otherwise enjoy in future

---

**8.** We do not address privilege exceptions relating to military secrets or other exempted communications.

**9.** The district court did not rule upon this argument, and hence we lack the benefit of that court's thinking in addition to a complete record

on the nature, scope, and content of communications between the President and Deputy White House Counsel with regard to the impeachment issue. *See Gilda Marx, Inc. v. Wildwood Exercise, Inc.,* 85 F.3d 675, 679 (D.C.Cir.1996) (per curiam).

congressional investigations and impeachment hearings.

Although the Independent Counsel and the Office of the President agree that White House Counsel can represent the President in the impeachment process, the precise contours of Counsel's role are far from settled.[10] In any event, no matter what the role should be, impeachment is fundamentally a *political* exercise. *See* THE FEDERALIST No. 65 (Alexander Hamilton); JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 764, at 559 (5th ed.1905). Impeachment proceedings in the House of Representatives cannot be analogized to traditional legal processes and even the procedures used by the Senate in "trying" an impeachment may not be like those in a judicial trial. *See (Walter) Nixon v. United States*, 506 U.S. 224, 228–31, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993); STORY, COMMENTARIES ON THE CONSTITUTION § 765, at 559–60. How the policy and practice supporting the common law attorney-client privilege would apply in such a political context thus is uncertain. In preparing for the eventuality of impeachment proceedings, a White House Counsel in effect serves the President as a political advisor, albeit one with legal expertise: to wit, Lindsey occupies a dual position as an Assistant to the President and a Deputy White House Counsel. Thus, information gathered in preparation for impeachment proceedings and conversations regarding strategy are presumably covered by executive, not attorney-client, privilege. While the need for secrecy might arguably be greater under these circumstances, the district court's ruling on executive privilege is not before us. In addition, in responding to the grand jury investigation and gathering information in preparation for future developments in accordance with his official duties, White House Counsel may need to interact with the President's private attorneys, and to that extent other privileges may be implicated. [[ ]]

Nor is our conclusion altered by the Office of the President's concern over the possibility that Independent Counsel will convey otherwise privileged grand jury testimony of White House Counsel to Congress.[11] *Cf.* FED. R.CRIM. P. 6(e). First, no one can say with certainty the extent to which a privilege would generally protect a White House Counsel from testifying at a congressional hearing. The issue is not presently before the court.[12] *See Nixon*, 418 U.S. at 712 n. 19, 94 S.Ct. 3090; *In re Sealed Case (Espy)*, 121 F.3d at 739 nn. 9–10, 753. Second, the particular procedures and evidentiary rules to be employed by the House and Senate in any future impeachment proceedings remain entirely speculative. Finally, whether Congress can abrogate otherwise recognized

10. While a prior Comptroller General has thought that White House Counsel could properly be paid out of federal funds for representing the President in matters leading up to an impeachment, *see* Letter from Elmer B. Staats, U.S. Comptroller General, to Rep. John F. Seiberling 7 (Oct. 25, 1974), history yields little guidance on the role that White House Counsel would properly play in impeachment proceedings. The only President impeached by the House and tried by the Senate, Andrew Johnson, retained private counsel, and his Attorney General resigned from office in order to assist in his defense. *See* WILLIAM H. REHNQUIST, GRAND INQUESTS 222 (1992). In contrast, after the House Judiciary Committee began an impeachment inquiry into the Watergate scandal, President Richard Nixon appointed James D. St. Clair as a special counsel to the President for Watergate-related matters. *See* WATERGATE REPORT 103. Although Nixon resigned before the House of Representatives voted on any articles of impeachment, St. Clair handled much of the President's defense until the President's resignation. *See id.* at 103–15. At the very least, nothing prevents a President faced with impeachment from retaining private counsel, and in turn this makes less clear what might be the division of labor between White House Counsel and private counsel.

11. Contrary to the Office of the President's suggestion, this is not a novel concern stemming from the Ethics in Government Act. During initial discussions with the Watergate Special Prosecutor, "[James] St. Clair was primarily concerned that evidence produced for the grand jury not subsequently be provided by [the Special Prosecutor] to the House Judiciary Committee for use in its impeachment inquiry." WATERGATE REPORT 104–05. The Special Prosecutor eventually asked the grand jury to transmit an "evidentiary report" to the House Committee considering President Nixon's impeachment. *Id.* at 143.

12. The Office of the President cites no authority for the proposition that communications between White House Counsel and the President would be absolutely privileged in congressional proceedings, but rather merely suggests that they "should" be.

privileges in the course of impeachment proceedings may well constitute a nonjusticiable political question. *See (Walter) Nixon,* 506 U.S. at 236, 113 S.Ct. 732.

The Supreme Court's recognition in *United States v. Nixon* of a qualified privilege for executive communications severely undercuts the argument of the Office of the President regarding the scope of the government attorney-client privilege. A President often has private conversations with his Vice President or his Cabinet Secretaries or other members of the Administration who are not lawyers or who are lawyers, but are not providing legal services. The advice these officials give the President is of vital importance to the security and prosperity of the nation, and to the President's discharge of his constitutional duties. Yet upon a proper showing, such conversations must be revealed in federal criminal proceedings. *See Nixon,* 418 U.S. at 713, 94 S.Ct. 3090; *In re Sealed Case (Espy),* 121 F.3d at 745. Only a certain conceit among those admitted to the bar could explain why legal advice should be on a higher plane than advice about policy, or politics, or why a President's conversation with the most junior lawyer in the White House Counsel's Office is deserving of more protection from disclosure in a grand jury investigation than a President's discussions with his Vice President or a Cabinet Secretary. In short, we do not believe that lawyers are more important to the operations of government than all other officials, or that the advice lawyers render is more crucial to the functioning of the Presidency than the advice coming from all other quarters.

■ The district court held that a government attorney-client privilege existed and was applicable to grand jury proceedings, but could be overcome, as could an applicable executive privilege, upon a showing of need and unavailability elsewhere by the Independent Counsel. While we conclude that an attorney-client privilege may not be asserted by Lindsey to avoid responding to the grand jury if he possesses information relating to possible criminal violations, he continues to be covered by the executive privilege to the same extent as the President's other advisers. Our analysis, in addition to having the advantages mentioned above, avoids the application of balancing tests to the attorney-client privilege—a practice recently criticized by the Supreme Court. *See Swidler & Berlin,* — U.S. —, —, 118 S.Ct. 2081, 2086–87, 141 L.Ed.2d 379

■ In sum, it would be contrary to tradition, common understanding, and our governmental system for the attorney-client privilege to attach to White House Counsel in the same manner as private counsel. When government attorneys learn, through communications with their clients, of information related to criminal misconduct, they may not rely on the government attorney-client privilege to shield such information from disclosure to a grand jury.

## III. [[

]].

## IV.

Accordingly, for the reasons stated in this opinion, we affirm [[ ]].

In accordance with the Supreme Court's expectation that "the Court of Appeals will proceed expeditiously to decide this case," *Clinton,* —— U.S. at ——, 118 S.Ct. at 2079, any petition for rehearing or suggestion for rehearing *in banc* shall be filed within seven days after the date of this decision.

*It is so ordered.*

TATEL, Circuit Judge, dissenting from Part II and concurring in part and dissenting in part from Part III.

The attorney-client privilege protects confidential communication between clients and their lawyers, whether those lawyers work for the private sector or for government. Although I have no doubt that government lawyers working in executive departments and agencies enjoy a reduced privilege in the face of grand jury subpoenas, I remain unconvinced that either "reason" or "experience" (the tools of Rule 501) justifies this court's abrogation of the attorney-client privilege for lawyers serving the Presidency. This court's far-reaching ruling, moreover, may have been unnecessary to give this grand jury access to Bruce Lindsey's communications with the President, for on this record it is not clear whether those communications involved official legal advice that would be protected by the attorney-client privilege. Before limiting the attorney-client privilege not just for this President, but for all Presidents to come, the court should have first remanded this case to the district court to recall Lindsey to the grand jury to determine the precise nature of his communications with the President.

### I

My colleagues and I have no disagreement concerning personal legal advice Lindsey may have given the President. We agree, and the White House concedes, that the official attorney-client privilege does not protect such communications, for as a White House employee Lindsey had no authority to provide such advice. Nor do we disagree about political advice given to the President by advisers who happen to be lawyers. Such advice is protected, if at all, by the executive privilege alone. Our disagreement centers solely on whether a grand jury can pierce the attorney-client privilege with respect to official legal advice that the Office of White House Counsel gives a sitting President.

One of the oldest privileges at common law and " 'rooted in the imperative need for confidence and trust,' " *Jaffee v. Redmond,* 518 U.S. 1, 10, 116 S.Ct. 1923, 135 L.Ed.2d 337

(1996) (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)), the attorney-client privilege "encourage[s] 'full and frank communication between attorneys and their clients, and thereby promote[s] broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States,* 118 S.Ct. 2081, 2084–85 (1998) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). The privilege protects client confidences even in the face of grand jury subpoenas. *See id.* at 2083–84, 2087–88.

Government attorneys enjoy the attorney-client privilege in order to provide reliable legal advice to their governmental clients. "Unless applicable law otherwise provides, the attorney-client privilege extends to a communication of a governmental organization ... and of an individual officer ... of a governmental organization." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS ("RESTATEMENT") § 124 (Proposed Final Draft No. 1, 1996); *see also* PROPOSED FED. R. EVID. 503(a)(1), *reprinted in* 56 F.R.D. 183, 235 (1972). We have explained that where "the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests, [it] needs the same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors." *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 863 (D.C.Cir.1980); *see also Tax Analysts v. IRS,* 117 F.3d 607, 620 (D.C.Cir.1997) ("Communications revealing ... client confidences [between IRS field personnel and IRS counsel regarding audit activity] ... are clearly covered by the attorney-client privilege....").

This court now holds that for all government attorneys, including those advising a President, the attorney-client privilege dissolves in the face of a grand jury subpoena. According to the court, its new rule "avoids the application of balancing tests to the attorney-client privilege—a practice recently criticized by the Supreme Court." Maj. Op. at 1114. But whether a court abrogates the privilege by applying the balancing test rejected in *Swidler,* or by the rule the court

adopts today, the chilling effect is precisely the same. Clients, in this case Presidents of the United States, will avoid confiding in their lawyers because they can never know whether the information they share, no matter how innocent, might some day become "pertinent to possible criminal violations," *id.* at 1110. Rarely will White House counsel possess cold, hard facts about presidential wrongdoing that would create a strong public interest in disclosure, yet the very possibility that the confidence will be breached will chill communications. *See Swidler,* —— U.S. ——, —— – ——, 118 S.Ct. 2081, 2086–87, 141 L.Ed.2d 379 As a result, Presidents may well shift their trust on all but the most routine legal matters from White House counsel, who undertake to serve the Presidency, to private counsel who represent its occupant.

Unlike *Jaffee,* 518 U.S. at 10–11, 116 S.Ct. 1923 (recognizing a federal psychotherapy privilege), and *In re Sealed Case,* 148 F.3d at 1076 (D.C.Cir.1998) (declining to recognize a protective function privilege for Secret Service agents), this case involves not the creation of a new privilege but, as in *Swidler,* the carving out of an exception to an already well-established privilege. *See Swidler,* —— U.S. ——, ——, 118 S.Ct. 2081, 2086–87, 141 L.Ed.2d 379 Denying that they are creating an exception, my colleagues say that they are "defining the particular contours of the government attorney-client privilege," Maj. Op. at 1108, but no court has suggested that the attorney-client privilege must be extended client by client to each new governmental entity, proceeding by proceeding. Rather, "[u]nless applicable law otherwise provides," RESTATEMENT § 124, the privilege applies to all attorneys and all clients, regardless of their identities or the nature of the proceeding, *see Swidler,* —— U.S. ——, ——, 118 S.Ct. 2081, 2086–87, 141 L.Ed.2d 379 (finding no case authority for civil-criminal distinction). The question before us, then, is whether either "reason" or "experience" (FED. R. EVID. 501) calls for exempting the Presidency from the traditional attorney-client relationship that all clients enjoy with their lawyers. *See, e.g., Trammel,* 445 U.S. at 48, 52, 100 S.Ct. 906 (curtailing spousal

privilege based on majority trend in state law, the disappearance of "ancient" notions of the subordinate status of women, and the unpersuasiveness of arguments regarding privilege's effect on marital stability).

As one of its reasons for abrogating the presidential attorney-client privilege, the court says that legal advice is no different from the advice a President receives from other advisers—advice protected only by executive privilege. Maj. Op. at 1113–1114. I think the court seriously underestimates the independent role and value of the attorney-client privilege. Unlike the executive privilege—a broad, constitutionally derived privilege that protects frank debate between President and advisers, *see United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *In re Sealed Case*, 121 F.3d 729, 742–46 (D.C.Cir.1997)—the narrower attorney-client privilege flows not from the Constitution, but from the common law, *see Swidler*, —— U.S. ——, ——, 118 S.Ct. 2081, 2087–88 141 L.Ed.2d 379. The attorney-client privilege does not protect general policy or political advice—even when given by lawyers—but only communications with lawyers "for the purpose of obtaining legal assistance." RESTATEMENT § 122. Necessitated by the nature of the lawyer's function, the attorney-client privilege enables the lawyer as an officer of the court properly to advise the client, including facilitating compliance with the law. *See Upjohn*, 449 U.S. at 389, 101 S.Ct. 677. In other words, the unique protection the law affords a President's communications with White House counsel rests not, as my colleagues put it, on some "conceit" that "lawyers are more important to the operations of government than all other officials," Maj. Op. at 1114, but rather on the special nature of legal advice, and its special need for confidentiality, as recognized by centuries of common law. It therefore makes sense that the Presidency possesses both the attorney-client and executive privileges, and that courts treat them differently.

The court also cites 28 U.S.C. § 535(b). Although that statute generally supports qualifying—though not abrogating—the attorney-client privilege for government attorneys working in executive departments and agencies, the court acknowledges, as the Attorney General has told us in her *amicus* brief, that section 535(b) does not apply to the Office of the President. The court cites several statements, including former White House Counsel Lloyd Cutler's speech to the New York Bar, the White House Travel Office Management Review, and the Administration's *certiorari* petition in *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997), indicating that White House lawyers comply with the spirit of section 535(b). Maj. Op. at 1110–11. Nothing in those statements suggests, however, that their authors were referring to conversations between White House counsel and the President of the United States, *i.e.*, that one presidential subordinate (White House counsel) would report a confidential conversation with a President to another presidential subordinate (the Attorney General). The court points to no other statutory basis for denying the President the benefit of the official privilege. Although the Independent Counsel statute ensures independent, aggressive prosecution of wrongdoing, nothing in that statute disables a President from defending himself or otherwise indicates that Congress intended to deprive the Presidency of its official privileges.

The court refers to actions of a few previous White House counsel: Fred Buzhardt testified voluntarily before the Watergate grand jury; Peter Wallison turned over his diaries to the Iran–Contra investigation; and C. Boyden Gray and his deputy refused to be interviewed by that same Iran–Contra Independent Counsel. *See* Maj. Op. at 1111–1112. In my view, these limited and contradictory examples reveal nothing about the standard we should apply where, as here, a President of the United States actually invokes the attorney-client privilege in the face of a grand jury subpoena.

Acknowledging the facial inapplicability of section 535(b) to the Office of the President, the court relies on the government lawyer's oath of office for the proposition that White House counsel cannot have a traditional attorney-client relationship with the President.

But all lawyers, whether they work within the government or the private sector, take an oath to uphold the Constitution of the United States. In order to practice before this court, for example, attorneys must promise to "demean [themselves] ... according to law ... [and] support the Constitution of the United States." Application for Admission to Practice (U.S. Court of Appeals for the D.C. Circuit). No one would suggest that this oath abrogates a client's privilege in the face of a grand jury subpoena.

This court's opinion, moreover, nowhere accounts for the unique nature of the Presidency, its unique need for confidential legal advice, or the possible consequences of abrogating the attorney-client privilege for a President's ability to obtain such advice. Elected, head of the Executive Branch, Commander-in-Chief, head of State, and removable only by impeachment, the President is not just "a part of the federal government, consisting of government employees doing government business." Maj. Op. at 1102. As Justice Robert H. Jackson observed in the steel seizure case, the Presidency concentrates executive authority "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Echoing Justice Jackson three decades later, the Supreme Court emphasized in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), that the President "occupies a unique position in the constitutional scheme," *id.* at 749, 102 S.Ct. 2690, that we depend on the President for the "most sensitive and far-reaching decisions entrusted to any official under our constitutional system," *id.* at 752, 102 S.Ct. 2690, and that the President's "unique status under the Constitution" distinguishes him from other executive branch officials, *id.* at 750, 102 S.Ct. 2690. The Attorney General, focusing on the President's "singular responsibilities," describes the Presidency's critical need for legal advice as follows:

The Constitution vests the President with unique, and uniquely consequential, powers and responsibilities. The Nation's "executive Power" is vested in him alone. U.S. Const. Art. II, § 1. In addition to his significant and diverse domestic and foreign affairs responsibilities, he is specifically required to adhere to and follow the law, both in his oath of office (Art. II, § 1, Cl. 8) and in the requirement that "he shall take Care that the Laws be faithfully executed." Art. II, § 3. To fulfill his manifold duties and functions, the President must have access to legal advice that is frank, fully informed, and confidential. Because of the magnitude of the Nation's interest in facilitating the President's conduct of his office in accordance with law, the President's pressing need for effective legal advice knows no parallel in government.

*Amicus* Br. at 24. By lumping the President together with tax collectors, passport application processors, and all other executive branch employees—even cabinet officers—the court bypasses the reasoned " 'case-by-case' " analysis demanded by Rule 501. *Jaffee*, 518 U.S. at 8, 116 S.Ct. 1923 (quoting S. Rep. No. 93–1277, at 13 (1974), U.S.Code Cong. & Admin.News 1974 pp. 7051, 7059).

A President's need for confidential legal advice may "know[ ] no parallel in government" for another reason. Because the Presidency is tied so tightly to the persona of its occupant, and because of what *Fitzgerald* referred to as the Presidency's increased "vulnerability," stemming from "the visibility of [the] office and the effect of [the President's] actions on countless people," *Fitzgerald*, 457 U.S. at 753, 102 S.Ct. 2690, official matters—proper subjects for White House counsel consultation—often have personal implications for a President. Since for any President the line between official and personal can be both elusive and difficult to discern, I think Presidents need their official attorney-client privilege to permit frank discussion not only of innocuous, routine issues, but also sensitive, embarrassing, or even potentially criminal topics.

The need for the official presidential attorney-client privilege seems particularly strong

after Watergate which, while ushering in a new era of accountability and openness in the highest echelons of government, also increased the Presidency's vulnerability. Aggressive press and congressional scrutiny, the personalization of politics, and the enactment of the Independent Counsel statute, Pub.L. No. 95–521, Tit. VI, 92 Stat. 1824, 1867 (1978) (codified as amended at 28 U.S.C. §§ 591–599 (1994))—which triggers appointment of an Independent Counsel based on no more than the existence of "reasonable grounds to believe that further investigation is warranted," 28 U.S.C. § 592(c)(1)(A)—have combined to make the Supreme Court's fear that Presidents have become easy "target[s]," *Fitzgerald,* 457 U.S. at 753, 102 S.Ct. 2690, truer than ever. No President can navigate the treacherous waters of post-Watergate government, make controversial official legal decisions, decide whether to invoke official privileges, or even know when he might need private counsel, without confidential legal advice. Because of the Presidency's enormous responsibilities, moreover, the nation has compelling reasons to ensure that Presidents are well defended against false or frivolous accusations that could interfere with their duties. The nation has equally compelling reasons for ensuring that Presidents are well advised on whether charges are serious enough to warrant private counsel. I doubt that White House counsel can perform any of these functions without the candor made possible by the attorney-client privilege. As I said at the outset, weakening the privilege may well cause Presidents to shift their trust from White House lawyers who have undertaken to serve the Presidency, to private lawyers who have not.

Preserving the official presidential attorney-client privilege would not place the President above the law, as the Independent Counsel implies. To begin with, by enabling clients—including Presidents—to be candid with their lawyers and lawyers to advise clients confidentially, the attorney-client privilege promotes compliance with the law. *See Upjohn,* 449 U.S. at 389, 101 S.Ct. 677. Independent Counsels, moreover, have powerful weapons to combat abuses of the attorney-client privilege. If evidence suggested that a President used White House counsel to further a crime, the crime-fraud exception would abrogate the privilege. *See United States v. Zolin,* 491 U.S. 554, 562–63, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). If an Independent Counsel had evidence that White House counsel's status as an attorney was used to protect non-legal materials from disclosure, those materials would not be protected. *See State v. Philip Morris Inc.,* No. C1–94–8565, 1998 WL 257214, at *7 (Minn. Dist.Ct. Mar. 7, 1998) (releasing documents as penalty for bad faith claim of privilege). "The privilege takes flight," Justice Benjamin Cardozo wrote, "if the [attorney-client] relation is abused." *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933). Or if an Independent Counsel presented evidence that a White House counsel committed a crime, a grand jury could indict that lawyer. *See* George Lardner, Jr., *Dean Guilty in Cover–Up: Nixon Ex–Aide Pleads to Count of Conspiracy,* WASH. POST, Oct. 20, 1973, at A1. This Independent Counsel has never alleged that any of these abuses occurred.

To be sure, a properly exercised attorney-client privilege may deny a grand jury access to information, *see Swidler,* — U.S. —, —, 118 S.Ct. 2081, 2086–87, 141 L.Ed.2d 379 (justifying the burden placed on the truth-seeking function by the privilege), but Presidents remain accountable in other ways, *see Fitzgerald,* 457 U.S. at 757, 102 S.Ct. 2690 (checks on Presidential action include impeachment, press scrutiny, congressional oversight, need to maintain prestige, and concern for historical stature). An Independent Counsel, moreover, can always report to Congress that a President has denied critical information to a grand jury. *See* 28 U.S.C. § 595(a)(2), (c). If the President continues to exercise his attorney-client privilege in the face of a congressional subpoena, and if Congress believes that the President has committed "high Crimes and Misdemeanors," U.S. CONST. art. II, § 4, Congress can always consider impeachment. *See* H. REP. No. 93–1305, at 4, 187–213 (1974) (recommending impeachment of President Nixon based on his refusal to turn over information in response to congressional subpoenas).

## II

During Lindsey's several grand jury appearances he invoked both executive and attorney-client privileges, often with respect to the same questions. Now that the White House has dropped the executive privilege issue, much of that information may be available to the Independent Counsel, and we have no way of knowing which questions, if any, Lindsey would continue to decline to answer. Even more fundamental, Lindsey's affidavit, [[ ]] and the affidavit of White House Counsel Charles F.C. Ruff suggest that the communications between Lindsey and the President regarding the Monica Lewinsky and Paula Jones matters may have involved political and policy discussions, not legal advice. To be sure, the affidavits [[ ]] refer to advice about legal topics, such as invoking privileges and preparing for impeachment. But nowhere do they demonstrate that Lindsey rendered that advice in his capacity as a lawyer, *i.e.*, that "the lawyer's professional skill and training would have value in the matter." RESTATE-MENT § 122 cmt. b. A conversation is not privileged merely because the President asked Lindsey a question about a nominally legal matter or in his capacity as White House Counsel staff. For example, if Lindsey advised the President about the political implications of invoking executive privilege, that communication would not be privileged; if he discussed the availability of the privilege as a legal matter, the conversation would be protected.

Distinguishing between Lindsey's legal and non-legal advice becomes even more difficult because not only does Lindsey wear two hats, one legal (Deputy White House Counsel) and one non-legal (Special Assistant to the President), but the Office of White House Counsel has historically performed many non-legal functions, such as giving policy advice, writing speeches, and performing various political tasks. *See* STEPHEN HESS, ORGANIZING THE PRESIDENCY 36, 43, 84 (1988); Lloyd N. Cutler, *The Role of the Counsel to the President of the United States*, 35 REC-ORD OF THE ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK 470, 472–76 (1980); Jeremy Rabkin, *At the President's Side: The Role of the White House Counsel in Constitutional Policy*, LAW & CONTEMP. PROBS., Autumn 1993, at 63, 65–76. When an advisor serves dual roles, the party invoking the privilege bears a particularly heavy burden of demonstrating that the services provided were in fact legal. *See, e.g., Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir.1995) (where agency "delegated policymaking authority to its outside counsel to such an extent that counsel ceased to function as lawyers and began to function as regulators," it could not invoke attorney-client privilege); RESTATE-MENT § 122 cmt. c (whether privilege applies to lawyer acting in dual roles depends upon circumstances); *cf. In re Sealed Case*, 121 F.3d at 752 (with respect to " 'dual hat' presidential advisors, the government bears the burden of proving that the communications" are covered by the executive privilege).

Accordingly, before abrogating the official attorney-client privilege for all future Presidents, this court should have remanded to the district court to allow the Independent Counsel to recall Lindsey to the grand jury to determine whether, with respect to each question that he declines to answer, he can demonstrate the elements of the attorney-client privilege—namely, that each communication was made between privileged persons in confidence "for the purpose of obtaining or providing legal assistance for the client," RE-STATEMENT § 118. *See United States v. Kovel*, 296 F.2d 918, 923 (2nd Cir.1961) (remanding to permit accountant witness to offer factual support for assertion that communications were made in pursuit of legal advice). If Lindsey failed to meet this burden, that would end the matter, leaving for another day the difficult question of presidential attorney-client privilege, with its consequences for the functioning of the Presidency, as well as its potential implications for possible impeachment proceedings (implications we have hardly begun to consider). *See* Maj. Op. at 1112–1113; Office of the President Br. at 26–29; Office of the Independent Counsel Br. at 35; *cf. Amicus* Br. at 34–37. On the other hand, if Lindsey demonstrated that his communications involved official legal advice, the district court could use the remand to enrich the record by, for example, inviting former

White House counsel to describe the nature of the relationship between Presidents and White House counsel generally and the role of the attorney-client privilege in particular. This would create an infinitely more useful record for us, or eventually the Supreme Court, to determine whether reason or experience justifies any change in the official presidential attorney-client privilege and, if so, whether the privilege can be modified without threatening a President's ability to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. *See Swidler,* —— U.S. ——, —— n. 4, 118 S.Ct. 2081, 2085-86 n.4, 141 L.Ed.2d 379, (noting lack of empirical evidence in support of limiting the privilege); *Jaffee,* 518 U.S. at 16 & n. 16, 116 S.Ct. 1923 (relying on *amicus* briefs citing psychology and social work studies); *Trammel,* 445 U.S. at 48, 52, 100 S.Ct. 906 (relying on historical developments regarding the role of women in marriage).

I do not consider the Supreme Court's expectation that we proceed expeditiously to be inconsistent with our obligation to engage in fully reasoned and informed decision-making. The importance to the Presidency of effective legal advice requires no less. Moreover, according to the Independent Counsel, the grand jury is exploring whether obstruction of justice, perjury, witness intimidation, and other crimes were committed in January 1998. *See* 18 U.S.C. § 3282 (establishing five-year statute of limitations for non-capital federal crimes). We thus have time to determine whether we need to resolve this important question and, if so, to ensure that we do so on the basis of a fuller, more useful record. If the Independent Counsel needs to report to Congress more expeditiously, he is free to do so.

III [[